***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman. The parties have shown good grounds to reconsider the evidence concerning plaintiff's entitlement to benefits and late payment penalty and to receive further evidence regarding the issue of disability after the date of the hearing before the Deputy Commissioner. Accordingly, the Full Commission enters the following.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between defendant-employer and plaintiff.
3. The Hartford Insurance Company is the carrier on this claim.
4. Plaintiff's average weekly wage was $370.80 as of July 18, 1997.
5. Plaintiff's compensation rate is $247.34.
6. The parties stipulated into evidence the following:
a. IC Forms 19, 60, 24 and 33.
b. Administrative Decision and Order.
c. Packet of medical records and reports.
 d. Report by Dr. Freedman submitted after the hearing before the Deputy Commissioner.
7. The depositions of Dr. Waivers, Dr. Merrill, Dr. Brown, Dr. Muchiteni, Dr. Freedman, Dr. Charles and Dr. Mallenbaum are a part of the evidence of record.
 ***********
Based upon the evidence of record and the findings of fact found by the Deputy Commissioner, the Full Commission makes the following
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was forty-one years old and a high school graduate, with additional training and certification in automotive work and training in auto body painting. Plaintiff served in the army and worked as a letter carrier as a contractor for the post office prior to his employment with defendant employer. In January 1997, plaintiff began working for defendant-employer in Washington. Defendant-employer manufactured trucks and plaintiff's job involved painting the truck bodies.
2. On July 18, 1997, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment. He was in the process of putting a dolly under one end of a truck body when the other end fell off of a forklift and landed such that the dolly struck plaintiff forcefully in the chin, knocking him into the air. He was stunned by the blow but subsequently advised medical personnel that he did not believe that he lost consciousness. The laceration he sustained to his chin was sutured locally and he was then sent to Pitt County Memorial Hospital for evaluation. X-rays taken there revealed that there was a non-displaced fracture to the synthesis of his mandible. The emergency room physician consulted with Dr. Garrison, a plastic surgeon, regarding the fracture and with the trauma team regarding a possible closed head injury. A CT scan was also ordered and it showed no evidence of intercranial injury.
3. When Dr. Garrison evaluated plaintiff on July 19, 1997, plaintiff had no complaints regarding his vision, headaches or dizziness. She performed surgery that day to stabilize the mandible fracture using arch bars and intermaxillary fixation. She also revised the chin laceration repair. Plaintiff's jaws were wired shut in the operation and he had to eat a liquid diet afterwards. Approximately a month later Dr. Garrison indicated that his fracture had healed sufficiently so that he could see a dentist regarding the tooth damage he had sustained in the accident. Consequently, on September 5, 1997, plaintiff went to Dr. Brown, but plaintiff's mouth was still so tender and swollen that Dr. Brown could not properly examine him, so she gave him a mouth rinse to use to reduce the swelling. When plaintiff returned to Dr. Brown on September 9, 1997, she x-rayed plaintiff's mouth and found that he had fractures to six teeth. Plaintiff also had class II mobility of another tooth. Dr. Brown referred him to Dr. Muchiteni, an oral surgeon, for removal of the teeth that could not be restored.
4. Dr. Muchiteni examined plaintiff on September 15, 1997 and then on September 26, 1997 performed the procedure where he extracted six teeth and removed the arch bars from plaintiff's mouth. Plaintiff subsequently returned to Dr. Brown for teeth cleaning and follow-up care. Dr. Brown used amalgam filling to repair one of the damaged teeth that could be restored.
5. Plaintiff was subsequently given the option of having implants or bridgework to replace his missing teeth, and plaintiff advised Dr. Brown that he preferred the bridgework. However, this medical care had not been provided as of the date of hearing before the Deputy Commissioner.
6. Dr. Garrison followed plaintiff for the jaw fracture until October 29, 1997. At that time plaintiff's jaw was very stable and he had good occlusion of his mouth. Consequently, Dr. Brown released plaintiff from her care at that time.
7. Dr. Garrison had previously recommended that plaintiff seek treatment for possible hypertension from an internist, and plaintiff began seeing Dr. Waivers beginning in August 1997. Dr. Waivers monitored plaintiff's blood pressure for a month to see if plaintiff's high blood pressure was merely a temporary episode and if plaintiff's blood pressure would decrease. However, plaintiff blood pressure remained elevated and Dr. Waiver placed him on medication. Plaintiff continued to have problems with high blood pressure and began to complain of fatigue. When a change in medication did not resolve the problem, Dr. Waivers referred plaintiff to Dr. Merrill, a nephrologist specializing in treatment of hypertension.
8. Dr. Merrill examined plaintiff on December 2, 1997 and ordered a battery of tests to determine if there was an identifiable cause of his hypertension. A CT scan of plaintiff's head showed no evidence of any central nervous system injury and testing of his kidney function ultimately revealed no abnormalities. Plaintiff's lab tests were also normal. Dr. Merrill concluded that plaintiff had essential hypertension of unknown etiology, the predominant form of hypertension found in the public generally. Plaintiff had risk factors for essential hypertension, including his gender, his race and a family history with his mother having been hypertensive. Dr. Merrill increased plaintiff's medication and followed his progress, but plaintiff continued to have chronic problems with uncontrolled blood pressure and was not compliant with taking his medication, due in part to financial issues.
9. Defendants admitted liability for benefits under the Workers' Compensation Act for plaintiff's July 18, 1997 injury pursuant to a Form 60 which was filed with the Commission and is incorporated herein by reference. However, defendants denied liability for plaintiff's hypertension and did not pay for his evaluations and treatment. Defendants also submitted a Form 24 request to stop payment on October 21, 1997 on the basis that plaintiff had been released to return to work by his treating physicians and dentist. Plaintiff objected and an informal hearing was subsequently held, but the Commission was unable to reach a decision administratively regarding that issue. Consequently, the case was placed on the hearing docket for a full evidentiary hearing before a Deputy Commissioner.
10. Dr. Garrison released plaintiff to return to work on September 22, 1997. On October 22, 1997, Dr. Brown indicated that plaintiff was off of all of his medications and could resume his normal activities. Insofar as the injuries plaintiff sustained on July 18, 1997 were concerned, plaintiff could have returned to work in his regular job by the time defendants submitted the Form 24. He did not attempt to return to work, however, and on October 21, 1997 Dr. Waivers advised that he should stay out of work due to his elevated blood pressure, a recommendation with which Dr. Merrill subsequently disagreed. In any event, by the greater weight of the evidence, plaintiff's hypertension was not a proximate result of this accident. Although he was not aware that he had high blood pressure before he was hurt, the condition is largely asymptomatic and many people are unaware that they have high blood pressure until it is checked at a doctor's office. Except for a pre-employment physical for the post office, plaintiff could not remember when he had last seen a doctor, and the results of the pre-employment physical were not placed into evidence. Dr. Merrill, who was the specialist regarding this issue, did not find a causal relationship between the injury and plaintiff's hypertension and his opinion has been given greater weight.
11. Although plaintiff's hypertension is found herein to be unrelated to plaintiff' injury, Dr. Merrill had indicated that head injuries can cause hypertension. Consequently, an evaluation to determine whether there was a causal relationship was appropriate and necessary in order to determine the course of medical treatment for plaintiff's injury.
12. Following the injury in question, plaintiff began to complain of headaches. He was seen by an ophthalmologist on September 2, 1997 who was of the impression that his headaches were related to his jaw fracture and broken teeth. When plaintiff subsequently saw Dr. Merrill, plaintiff indicated that there did not appear to be a correlation between the headaches and his blood pressure. Dr. Waivers subsequently referred him to Dr. Lee, a neurologist. However, Dr. Lee's report is not a part of the evidentiary record but Dr. Lee was apparently of the opinion that the headaches were post-traumatic in origin.
13. On November 22, 1999, plaintiff was evaluated by Dr. Freedman, a neurologist, regarding his chronic headaches. Dr. Freedman indicated that some of plaintiff's headaches were probably related to his accident and recommended that plaintiff have an evaluation for temporomadibular joint (TMJ) dysfunction since headaches can result from TMJ dysfunction and since plaintiff appeared to be clinching his jaws. In addition, Dr. Freedman recommended a more aggressive treatment approach to attempt to control plaintiff's headaches. Plaintiff had been taking over-the-counter medication to treat the headaches and apparently had not received appropriate medical treatment. The treatment recommended by Dr. Freedman is reasonably necessary to effect a cure and give plaintiff relief with respect to plaintiff's headaches suffered as a result of his injury at work. However, the headaches have not prevented plaintiff from working, so the treatment would not lessen his disability.
14. Plaintiff has also complained of memory and concentration problems since his injury. In association with his social security disability claim, he was evaluated by Dr. Mallenbaum, a clinical psychologist, on June 3, 1998. Dr. Mallenbaum performed some testing to assess plaintiff's intelligence and memory functions. Plaintiff tested in the high range of mental retardation, but his vocabulary appeared to be higher than that level. Memory scale testing showed his attention, concentration and verbal memory to be consistent with his intelligence scores, but he had problems with visual memory. Although Dr. Mallenbaum considered the possibility that he could have brain damage from trauma, the psychologist did not perform the battery of neuropsychological tests necessary to assess that question. Plaintiff's claim was subsequently reviewed by Dr. Charles, a psychologist with the Social Security Administration. However, Dr. Charles did not perform an independent evaluation of plaintiff and did not have plaintiff undergo further testing.
15. Plaintiff has never been properly evaluated to determine whether he has sustained brain damage as a result of his injury at work. In view of his complaints of memory problems, it appears that an evaluation is reasonably necessary. In addition, it also appears that this case should be referred to the Nurses' Section of the Commission to provide assistance in coordinating plaintiff's medical evaluations and treatment.
16. Plaintiff has not reached maximum medical improvement. Consequently, no findings are made at this time regarding the extent of permanent partial impairment he may sustain as a result of his injury, including the extent of body damage he sustained from the loss of his six teeth.
17. In late March 1998, defendants unilaterally terminated plaintiff's disability compensation without an order of the Commission. The first order of the Commission which allowed defendants to terminate benefits was not until the Opinion and Award filed on July 16, 2001 by Deputy Commissioner Chapman.
18. There is insufficient evidence of record from which to determine plaintiff's disability after the hearing before the Deputy Commissioner and additional medical evidence is necessary to make that determination.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as a matter of law the following
 CONCLUSIONS OF LAW
1. On July 18, 1997, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. G.S. § 97-2 (6).
2. The greater weight of the evidence demonstrates that plaintiff has remained disabled through the date of the Opinion and Award filed by the Deputy Commissioner on July 16, 2001 though defendants unilaterally terminated plaintiff's benefits in late March 1998 contending that plaintiff was capable of performing his regular job duties by October 21, 1997. Consequently, subject to a reasonable attorney's fee, plaintiff is entitled to total disability compensation from October 21, 1997 and continuing until July 16, 2001 to be paid in one lump sum. G.S. §97-29; G.S. § 97-18.1.
3. For defendants' unilateral termination of plaintiff's benefits in violation of G.S. § 97-18.1 and Industrial Commission Rule 404, plaintiff is entitled to a ten percent (10%) late payment penalty to be paid by defendants. G.S. § 97-18.1; Industrial Commission Rule 404.
4. There is insufficient evidence of record to determine plaintiff's disability after the date of the Deputy Commissioner's Opinion and Award of July 16, 2001. Therefore, in the discretion of the Full Commission, the parties are entitled to submit additional medical evidence concerning plaintiff's entitlement to disability benefits subsequent to July 16, 2001. G.S. § 97-85.
5. Subject to the limitations of G.S. § 97-25.1, plaintiff is entitled to have defendants provide all reasonably necessary medical treatment which tends to effect a cure, provide relief or lessen the period of disability related to plaintiff's injury by accident. Plaintiff is further entitled to have defendants provide the bridgework for the teeth he lost as a result of the accident, the additional evaluation and treatment recommended by Dr. Freedman regarding plaintiff's chronic headaches and appropriate neuropsychological evaluation regarding the issue of whether he has sustained a brain injury as a result of the accident. G.S. § 97-2(19); G.S. § 97-25; G.S. § 97-25.1.
6. Plaintiff is not entitled to workers' compensation benefits for his hypertension which was not caused by his compensable injury. However, plaintiff is entitled to have defendants provide the evaluation by Dr. Merrill and the testing which was necessary to determine whether there was a causal relationship and rule out a traumatic origin of plaintiff's hypertension. G.S. § 97-2 et seq.; G.S. § 97-2(19); G.S. §97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Defendants shall reinstate plaintiff's total disability benefits beginning as of the date of termination in late March 1998 and ending as of the date of the Opinion and Award of July 16, 2001. This amount has accrued and shall be paid in one lump sum, subject to reasonable attorney's fees allowed herein.
2. Subject to the limitations of G.S. § 97-25.1, defendants shall pay all reasonably necessary medical expenses which tend to effect a cure, provide relief or lessen the period of disability incurred by plaintiff as a result of his injury by accident, including those arising from the placement of bridgework in his mouth to replace the teeth he lost as a result of the accident, the evaluation and treatment for headaches recommended by Dr. Freedman and appropriate neuropsychological evaluation regarding the issue of whether plaintiff has sustained a brain injury as a result of this accident. Defendants are not liable for the medical treatment plaintiff received as a result of his hypertension except for the evaluation by Dr. Merrill and any tests ordered by him to determine if there was a causal relationship between the injury accident and plaintiff's high blood pressure.
3. Defendants shall pay to plaintiff a ten percent (10%) late payment penalty for the unilateral termination of plaintiff's benefits without an order of the Commission.
4. A reasonable attorney's fee is hereby approved in the amount of twenty-five percent (25%) of the compensation awarded plaintiff herein and shall be paid by deducting the same from the amount due plaintiff to be paid directly to plaintiff's attorney.
5. The issue of plaintiff's entitlement to further disability benefits is hereby held in abeyance. Following the recommended evaluation and any necessary depositions, the parties shall submit such additional medical evidence and briefs concerning plaintiff's entitlement to further disability benefits to this Full Commission panel.
6. This claim is hereby referred to the Nurses' Section of the Industrial Commission.
7. Defendants shall pay the costs.
This the ___ day of March 2002.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ THOMAS J. BOLCH COMMISSIONER